# 16-3085

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

◆

DEUTSCHE BANK SECURITIES INC., JANET SIBLE, MARK WESTHOFF,
MICHAEL JACOBY, MARY ANN COLEMAN, MICHAEL RAPHAEL,
J. RALPH PARKER, NANCY FAHMY, DB ALEX.BROWN LLC,

*Plaintiffs-Counter-Defendants-Appellees,*

—against—

THOMAS M. ROSKOS, JR., DR. THOMAS ROSKOS, SR., BRION APPLEGATE,
EDDY ASLANIAN, TOM JERMOLUK,

*Defendants-Counter-Claimant-Counter-Defendants-Appellants,*

VAL VADEN, LILLI J. REY,

*Defendants-Counter-Claimants-Counter-Defendants.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX FOR DEFENDANTS-
COUNTER-CLAIMANT-COUNTER-DEFENDANTS-APPELLANTS

SPENSER Q. FRIEL
SCOTT HESSELL
SPERLING & SLATER, P.C.
55 West Monroe Street, Suite 3200
Chicago, Illinois 60603
(312) 641-3200

*Attorneys for Defendants-Counter-
Claimant-Counter-Defendants-
Appellants*

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES ...................................................................

PRELIMINARY STATEMENT ............................................................1

JURISDICTION....................................................................................2

QUESTIONS PRESENTED..................................................................2

STATEMENT OF THE CASE...............................................................3

    A.    RELEVANT FACTS ........................................................4

        1.    Appellees were registered with FINRA between 2000 and 2002 ........................................................................4

        2.    Appellees defrauded the CARDS Investors into CARDS Transactions, which involved a series of pre-arranged steps designed to generate tax-sheltering benefits. .............................4

        3.    The Registered Brokers provided the CARDS Investors with brokerage services in connection with their CARDS transactions and received transaction-based compensation in return................................5

    B.    RELEVANT PROCEDURAL HISTORY..........................................6

SUMMARY OF ARGUMENT ..............................................................8

STANDARD OF REVIEW ...................................................................11

ARGUMENT ........................................................................................11

    I.    THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT FOR APPELLEES.......................................................11

A.   FINRA Rule 12200 entitles the CARDS Investors to compel arbitration against all Appellees because they are "customers"of the Registered Brokers.......................................11

B.   The undisputed evidence on summary judgment established that the CARDS Investors were "customers" of the Registered Brokers under FINRA Rule 12200. ........................12

  1.   The provision of services and receipt of transaction-based compensation in return, directly or indirectly, establishes a "customer" relationship under FINRA Rule 12200.........................................................12

  2.   The Registered Brokers performed brokerage services on the CARDS Investors' behalf and received transaction-based compensation in return........15

C.   The district court misconstrued *Abbar* in finding no "customer" relationship with the Registered Brokers. .............19

II.   THE DISTRICT COURT ERRED IN REFUSING TO ALLOW ADDITIONAL DISCOVERY REGARDING THE REGISTERED BROKERS' TRANSACTION-BASED COMPENSATION.............23

CONCLUSION .......................................................................25

## TABLE OF AUTHORITIES

**Page**

**Cases**

*Chipanno v. Champion Int'l Corp.*,
    702 F.2d 827 (9th Cir. 1983) ........................................................................24

*Citigroup Global Markets Inc. v. Abbar*,
    761 F.3d 268 (2d Cir. 2014) .................................................................passim

*Dougherty v. VFG, LLC*,
    118 F. Supp. 3d 699, 709 n. 5.................................................................. 12-13

*John Hancock Life Ins. Co. v. Wilson*,
    254 F.3d 48 (2d Cir. 2001) ............................................................. 11-12, 20

*Kaplan v. Axelrod*,
    1990 WL 16148 (S.D.N.Y. Feb. 15, 1990) ...................................................18

*Miller v. Wolpoff & Abramson, L.L.P.*,
    321 F.3d 292 (2d Cir. 2003) ..................................................................23, 24

*Moll v. Telesector Res. Grp., Inc.*,
    760 F.3d 198 (2d Cir. 2014) ........................................................................11

*Seat Sack, Inc. v. Childcraft Educ. Corp.*,
    2010 WL 245576 (S.D.N.Y. Jan. 22, 2010)................................................18

*Triad Advisors, Inc. v. Siev*,
    60 F. Supp. 3d 395 (E.D.N.Y. 2014)................................................... 8, 14-15

*Twenty-First Sec. Corp. v. Crawford*,
    2011 WL 6326128 (S.D.N.Y. Dec. 15, 2011)..................................... 8, 13-14

*Twenty-First Sec. Corp. v. Crawford*,
    502 F. App'x 64 (2d Cir. 2012)................................................................8, 14

*UBS Fin. Servs., Inc. v. W. Virginia Univ. Hosps., Inc.*,
    660 F.3d 643 (2d Cir. 2011) ........................................................................12

iii

*Wagner v. Access Cash Int'l Inc.*,
    212 F. Supp. 2d 886 (C.D. Ill. 2002)............................................................18

*Zaretsky v. William Goldberg Diamond Corp.*,
    820 F.3d 513 (2d Cir. 2016) .........................................................................11

**Statutes**

28 U.S.C. § 1291 .....................................................................................................2
28 U.S.C. § 1331 .....................................................................................................2

**Rules**

FINRA Code, Rule 12100 (a) and (r) .....................................................................11
FINRA Code, Rule 12200..................................................................................passim

**Other Authority**

FINRA Regulatory Notice 12-55...............................................................................9

## PRELIMINARY STATEMENT

Thomas M. Roskos, Dr. Thomas Roskos, Sr., Brion Applegate, Eddy Aslanian and Tom Jermoluk (the "CARDS Investors") were each defrauded by Appellees and their co-conspirators into Custom Adjustable Rate Debt Structure ("CARDS") transactions, which were marketed as loans with legitimate tax-saving benefits but were in reality, unbeknownst to the CARDS Investors, nothing more than illegal tax shelters. The wrongful conduct of Deutsche Bank and its agents in connection with these CARDS transactions was revealed in a December 2010 non-prosecution agreement ("NPA"), in which Deutsche Bank agreed to pay the U.S. Government over a half-billion dollars in fines and promoter penalties based on its involvement in CARDS and other fraudulent tax shelters. In the NPA, Deutsche Bank, including its brokerage firm entities Deutsche Bank Securities Inc. ("DBSI") and DB Alex. Brown, LLC ("DB Alex. Brown"), admitted that it "unlawfully, willfully and knowingly participated" in fraudulent tax shelters like the ones it sold Appellants and that "it was wrong and unlawful" for it to have done so.

To implement the CARDS Investors' transactions, Deutsche Bank registered brokers—Janet Sible, Mark Westhoff, Michael Jacoby, J. Ralph Parker, Nancy Fahmy, Michael Raphael and Mary Ann Coleman (the "Registered Brokers")— executed or supervised the execution of securities transactions on the CARDS Investors' behalf, pursuant to express letters of authorization drafted by Deutsche Bank for the CARDS Investors' signature. The Registered Brokers were then paid transaction-based compensation in return for their work. Accordingly, the CARDS

Investors were unquestionably the Registered Brokers' "customers" for purposes of Financial Industry Regulatory Authority ("FINRA") Code of Arbitration Rule 12200, and should be able to compel arbitration of disputes arising from their CARDS transactions with the Registered Brokers and their brokerage firm employers. The district court below erred in granting summary judgment that the CARDS Investors were not "customers" under Rule 12200 and permanently enjoining the CARDS Investors' previously-filed FINRA arbitration (the "FINRA Arbitration").

## JURISDICTION

The district court had subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because the FINRA Arbitration includes a claim for violation of federal statutes. This Court has jurisdiction pursuant to 28 U.S.C. § 1291. The district court issued its Memorandum Opinion and Order granting summary judgment to Appellees on August 4, 2016, and judgment was entered on August 5, 2016. This was a final judgment disposing of all the parties' claims. Timely notice of appeal was filed on September 6, 2015 (the Tuesday after Labor Day).

## QUESTIONS PRESENTED

1.      Whether the district court erred in denying the CARDS Investors' motion for summary judgment and granting Appellees' motion for summary judgment, where the undisputed evidence established that the Registered Brokers executed or supervised the execution of securities transactions on behalf of the

2

CARDS Investors and were paid transaction-based compensation in return for their work.

2.      Whether the district court erred in refusing to allow the CARDS Investors to obtain additional discovery concerning the Registered Brokers' transaction-based compensation, and then granting Appellees' motion for summary judgment based on a purported lack of evidence regarding the Registered Brokers' transaction-based compensation.

## STATEMENT OF THE CASE

This is an appeal from an order of the United States District Court for the Southern District of New York (Swain, J.) granting, in part, summary judgment in favor of Appellees and against the CARDS Investors, and denying the CARDS Investors' cross-motion for summary judgment—holding that the CARDS Investors were not "customers" of the Registered Brokers under FINRA Rule 12200, declaring that the CARDS Investors could not compel arbitration of their claims against Appellees in the FINRA Arbitration, and permanently enjoining the FINRA Arbitration. The CARDS Investors also appeal from two of Judge Swain's orders refusing to allow additional discovery regarding the "customer" issue.[1]

---

[1]      Judge Swain granted the CARDS Investors' motion for summary judgment as to claims brought in the FINRA Arbitration by Val Vaden (and his ex-wife Lilli J. Rey) against DB Alex. Brown, LLC only, because Vaden received an account statement from DB Alex Brown in connection with his CARDS transaction. (SPA-16.) The Court did not compel the Vadens' broker (Parker) to arbitrate even though his name is listed on the account statements. Nonetheless, Val Vaden and Lilli J. Rey (who filed joint federal income tax returns with Val Vaden for the relevant tax years) are not parties to this appeal.

3

**RELEVANT FACTS**

**1.    Appellees were registered with FINRA between 2000 and 2002.**

DB Alex. Brown was a brokerage firm registered with FINRA until 2001.

(A-66, A-477.)[2] DBSI was and currently is a brokerage firm registered with

FINRA, and became the successor brokerage firm to DB Alex. Brown beginning in

2001. (A-66, A-494.) Sible, Westhoff, Jacoby, Fahmy, Raphael, Parker and

Coleman were all FINRA-registered brokers between 2000 and 2002, and were

registered with DBSI or DB Alex. Brown when they provided services to the

CARDS Investors. (A-60–61, A-66, A-516, A-523, A-534, A-543, A-559, A-568,

A-578.)

**2.    Appellees defrauded the CARDS Investors into CARDS
        Transactions, which involved a series of pre-arranged steps
        designed to generate tax-sheltering benefits.**

Between 2000 and 2002, the CARDS Investors each participated in separate

CARDS transactions with Deutsche Bank. (A-66.) As alleged in the FINRA

Arbitration, they were each defrauded into these transactions by Appellees and

their co-conspirators' claims that the transactions had the possibility for profit and

were legal and legitimate under the tax code. (A-343–372.) The CARDS Investors'

claims against Appellees in the FINRA Arbitration arose out of Appellees' actions

in connection with the CARDS Investors' transactions. (A-66–67.)

---

[2]     "A-__" indicates citations to the Joint Appendix; "SPA-__" indicates
citations to the Special Appendix.

The CARDS transactions operated in a series of prearranged steps, and were designed to generate tax-sheltering benefits for each CARDS Investor. In general outline:

- For each transaction, Deutsche Bank entered into a credit agreement with a third-party foreign LLC. Pursuant to the terms of the credit agreement, the foreign LLC was required to immediately deposit the loan proceeds in Euros as collateral in an account with Deutsche Bank, which was split up in two pots of funds—one approximately 85% of the loaned Euros, and the other approximately 15%. The 85% share was used to purchase a Euro-denominated promissory note (or "certificate of deposit") from Deutsche Bank, which was also deposited with Deutsche Bank as collateral.

- Each CARDS Investor purchased the smaller (approximately 15%) share of loan proceeds in exchange for assuming joint and several liability on the entire loan. Each CARDS Investor became a "Co-Obligor" on the loan and received a promissory note from Deutsche Bank for the 15% share of Euro loan proceeds, which was also required to be retained by Deutsche Bank as collateral.

- Each CARDS Investor directed that the Euro-denominated promissory note be liquidated and converted at least a portion to United States Dollars, triggering a taxable event.

(A-22–24, A-374–376, A-378–380.)

### 3. The Registered Brokers provided the CARDS Investors with brokerage services in connection with their CARDS transactions and received transaction-based compensation in return.

The Registered Brokers provided services in connection with the securities trades executed as part of the CARDS Investors' transactions. (A-61.) In particular, on behalf of the CARDS Investors, the Registered Brokers executed or supervised the execution of foreign exchange swaps and promissory note transactions. (A-

381–403, A-408, A-423, A-429–447, A-601 at ¶ 10.) These foreign exchange trades and promissory note transactions were central to the tax benefit that each CARDS Investor was supposed to achieve, and the Registered Brokers understood and attempted to ensure that the transactions generated those tax benefits. (A-23–24, A-375, A-379–380, A-468, A-470.) The Registered Brokers executed the foreign exchange trades and promissory note transactions solely at the direction of and as expressly authorized by the CARDS Investors. (A-448–466.)

Deutsche Bank then provided the Registered Brokers with transaction-based compensation for their work on the CARDS Investors' transactions by "recognizing" revenue to the Registered Brokers from those transactions. (A-472.)

## A.   RELEVANT PROCEDURAL HISTORY

The CARDS Investors filed the FINRA Arbitration against certain of the Appellees, following which those Appellees brought suit in the district court to enjoin the arbitration and declare the CARDS Investors' claims non-arbitrable. The parties agreed to stay the arbitration pending a final decision by the district court, and then agreed to lift the stay for the limited purpose of allowing the CARDS Investors to add additional respondents (the remaining Appellees), who were added in the operative Amended Statement of Claim, filed with FINRA on April 22, 2015. (A-343–372.) Appellees then filed the operative First Amended Complaint in the district court on May 12, 2015. (A-18–29.)

The parties then engaged in limited discovery, although Appellees did not

6

formally respond to the CARDS Investors' discovery requests, instead agreeing only to produce documents as part of "informal" discovery. (A-75.) Appellees refused to agree to any depositions, and the CARDS Investors requested that the district court compel limited scope depositions of Appellees concerning the "customer" issue, as well as other additional discovery. (A-76–77.) On October 30, 2015, the district court denied the CARDS Investors' requests for additional discovery in their entirety. (SPA-1.)

After Appellees moved for summary judgment on December 7, 2015, the CARDS Investors again moved, pursuant to FRCP 56(d), for limited discovery (including for depositions of the Registered Brokers concerning their compensation from their work on the CARDS Investors' transactions). (SPA-2–5.) The Court again denied the CARDS Investors' requests in their entirety. (*Id.*)

Following briefing on the parties' cross-motions for summary judgment, the district court noted that it was "undisputed that the [Registered Brokers] executed or supervised the execution of various foreign exchange swaps or similar securities transactions on behalf of [the CARDS Investors]." (SPA-9.) Nevertheless, the district court granted Appellees' motion and denied the CARDS Investors' cross-motion, reasoning that the CARDS Investors had "produced no evidence demonstrating that the compensation that the [Registered Brokers] may have received directly or indirectly in connection with the CARDS transactions was anything other than an ancillary consequence of the compensation they received as employees of DBSI or DB Alex. Brown." (SPA-15.) The district court also

reasoned that that the CARDS Investors' "core transactional relationships" were with Deutsche Bank AG, a non-FINRA entity, and that the securities transactions executed by the Registered Brokers on behalf of the CARDS investors were merely "ancillary transactions." (*Id.*) In the district court's view, this result was required under this Court's decision in *Citigroup Global Markets Inc. v. Abbar*, 761 F.3d 268, 275 (2d Cir. 2014).

## SUMMARY OF ARGUMENT

Under *Abbar*, an individual's purchase of a service from a FINRA member or "associated person" makes the individual a "customer" for purposes of FINRA Rule 12200, such that the individual may compel arbitration in FINRA. *Abbar,* 761 F.3d at 274-275. Cases in the Second Circuit both before and after *Abbar* have made clear that this "purchase" need not involve the direct transfer of money from the customer to the FINRA member or associated person—a "customer" relationship exists where a FINRA member or associated person receives transaction-based compensation for services on the customer's behalf. *See Triad Advisors, Inc. v. Siev*, 60 F. Supp. 3d 395, 397 (E.D.N.Y. 2014); *Twenty-First Sec. Corp. v. Crawford*, 2011 WL 6326128, at *2 (S.D.N.Y. Dec. 15, 2011), *aff'd,* 502 F. App'x 64 (2d Cir. 2012). The record establishes that the "customer" test is met here, as the Registered Brokers provided brokerage services on the CARDS Investors' behalf in connection with their CARDS transactions and were paid transaction-based compensation in return.

By holding that the CARDS Investors did not purchase services from the

Registered Brokers and were not "customers" of the Registered Brokers because their "core transactional relationships" were with a separate Deutsche Bank entity, the district court narrowed beyond recognition the *Abbar* court's "suitably broad" definition of a "customer" for purposes of FINRA Rule 12200. *Abbar,* 761 F.3d at 276. Nothing in *Abbar* suggests that an investor cannot simultaneously be the "customer" of multiple individuals or entities, and the fact that the CARDS Investors may also have been customers of Deutsche Bank AG (or other Deutsche Bank entities) does not preclude them from being customers of the Registered Brokers. Further, nothing in *Abbar* suggested that the prior cases holding that a "customer" relationship exists where a FINRA member or associated person receives indirect, transaction-based compensation are no longer good law. To the contrary, this Court in *Abbar* explicitly relied on the definition of "customer" in FINRA Regulatory Notice 12-55, which provides that a "customer" relationship exists for purposes of FINRA's suitability rule whether a broker's compensation is received "directly or indirectly."

The *Abbar* court's reference to the "customer" test as a "bright-line rule" does not counsel a different result. Finding a customer relationship based on the Registered Brokers' indirect receipt of transaction-based compensation is not difficult, and would not condemn the parties or courts in other cases to "wonder whether myriad facts will coalesce into a functional concept of the customer relationship." *Id.* To the contrary, finding a "customer" relationship here is compelled by the straight-forward test in *Abbar*—whether the CARDS Investors

9

purchased services from the Registered Brokers, either directly or indirectly. Finding a "customer" relationship on these facts also furthers FINRA's important function in the comprehensive regulation of securities transactions.

The CARDS Investors proffered sufficient evidence of the Registered Brokers' receipt of transaction-based compensation to support summary judgment in the CARDS Investors' favor. The only reasonable inference to be drawn from the evidence that Deutsche Bank "recognized" revenue for the Registered Brokers in connection with the CARDS Investors' transactions is that they were compensated on the basis of that "recognized" revenue. In any event, summary judgment should not have been entered in Appellees' favor based on a purported lack of evidence in this regard where the district court repeatedly rejected the CARDS Investors' attempts to obtain additional discovery on the issue.

The evidence of the Registered Brokers' receipt of transaction-based compensation is undisputed, as is the fact that the Registered Brokers executed or supervised the execution of securities transactions on behalf of the CARDS Investors. This is all that is required to make them "customers" of the Registered Brokers under FINRA Rule 12200 and Second Circuit law, and Appellees should thus be compelled to arbitrate the claims brought against them in the FINRA Arbitration. As such, this Court should reverse the district court's denial of the CARDS Investors' motion for summary judgment (and grant of Appellees' motion for summary judgment), and direct entry of summary judgment in favor of the CARDS Investors.

## STANDARD OF REVIEW

This Court reviews the district court's grant and denial of summary judgment *de novo. Zaretsky v. William Goldberg Diamond Corp.*, 820 F.3d 513, 519 (2d Cir. 2016). The district court's discovery rulings are reviewed for abuse of discretion. *Moll v. Telesector Res. Grp., Inc.*, 760 F.3d 198, 204 (2d Cir. 2014).

## ARGUMENT

### I. THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT FOR APPELLEES

#### A. FINRA Rule 12200 entitles the CARDS Investors to compel arbitration against all Appellees because they are "customers" of the Registered Brokers.

In relevant part, FINRA Rule 12200 provides that "[p]arties must arbitrate a dispute … if … [t]he dispute is between a customer and a member or associated person of a member." The Registered Brokers are "associated persons" of DBSI and/or DB Alex. Brown under this rule because they were registered with FINRA with DBSI and/or DB Alex. Brown. *See* FINRA Rule 12100(a) and (r); A-516, A-523, A-534, A-543, A-559, A-568, A-578. All Appellees must therefore arbitrate the claims brought against them in the FINRA Arbitration so long as the CARDS Investors were the Registered Brokers' "customers" in connection with their CARDS transactions. *John Hancock Life Ins. Co. v. Wilson*, 254 F.3d 48, 51, 59 (2d Cir. 2001) (FINRA member required to arbitrate investors' FINRA claims, even though investors were not customers of FINRA brokerage firm, because

11

investors were customers of FINRA member's associated person); *Abbar*, 761 F.3d at 274.

**B.      The undisputed evidence on summary judgment established that the CARDS Investors were "customers" of the Registered Brokers under FINRA Rule 12200.**

**1.      The provision of services and receipt of transaction-based compensation in return, directly or indirectly, establishes a "customer" relationship under FINRA Rule 12200.**

The Second Circuit has long held that the term "customer" for purposes of FINRA Rule 12200 should be understood broadly. *See John Hancock Life Ins.*, 254 F.3d at 51, 59 (refusing to accept FINRA member's "narrow definition of the term 'customer'" and noting that "the NASD [predecessor to FINRA] Code defines 'customer' broadly"); *UBS Fin. Servs., Inc. v. W. Virginia Univ. Hosps., Inc.*, 660 F.3d 643, 650-52 (2d Cir. 2011). This "broad" understanding of who constitutes a "customer"—and hence a "broad" understanding of who may compel arbitration in FINRA based on services from a FINRA member or "associated person"—makes sense in light of FINRA's important function in the comprehensive regulation of securities transactions. *See UBS Fin. Servs.*, 660 F.3d at 648 ("Since 2007, FINRA has been a self-regulatory organization established under Section 15A of the Securities Exchange Act of 1934 … and has had the authority to exercise comprehensive oversight over "all securities firms that do business with the public."); *Dougherty v. VFG, LLC*, 118 F. Supp. 3d 699, 709 n.5 (E.D. Pa. 2015)

12

("FINRA is a self-regulatory organization and has the authority to, *inter alia*, create and enforce rules for its members in order to provide regulatory oversight of all securities firms that do business with the public. … All rules and regulations promulgated by FINRA are approved by the SEC.") (internal citations omitted).[3] In *Abbar*, this Court reaffirmed that the definition of a "customer" should be "suitably broad." 761 F.3d at 276.

Consistent with this "broad" understanding of a "customer" under FINRA Rule 12200, courts in the Second Circuit have consistently found that the provision of services and the receipt of transaction-based compensation, even if received only indirectly, establishes a "customer" relationship. In *Twenty-First Securities Corp.*, Dr. Crawford invested $6 million in a fund ("1861 Capital") based on the recommendation of Robert Gordon, the president of Twenty-First Securities Corp. ("Twenty-First"). 2011 WL 6326128, at *1. Crawford invested through a Swiss investment firm, not Twenty-First, and Twenty-First was not an agent of 1861 capital. *Id.* Nevertheless, Twenty-First received from 1861 Capital a solicitation fee based on Crawford's investment, *Id.* After Crawford lost his $6 million investment, he commenced a FINRA arbitration against Twenty-First. *Id.* The

---

[3]     Section 15(a)(1) of the Exchange Act requires the registration with the SEC of any person that acts as a "broker" or "dealer" in securities in interstate commerce. Under Section 3(a)(4)(A) of the Exchange Act, a "broker" is defined generally to mean "any person engaged in the business of effecting transactions in securities for the accounts of others."

district court denied Twenty-First's motion for a preliminary injunction of the
FINRA arbitration, holding that Crawford was Twenty-First's customer because
Twenty-First provided services to him (investment advice) and received
transaction-based compensation in return (the solicitation fee from 1861 Capital).
*Id.* at *2. This Court affirmed. *Twenty-First Sec. Corp.*, 502 F. App'x at 66 ("[T]he
district court correctly concluded that Crawford was Twenty–First's 'customer'
with respect to his investment in the 1861 Fund.")

Similarly, in *Triad Advisors*, Tim Tehan, an "associated person" of Triad
Advisors, Inc. ("Triad Advisors"), advised defendants to invest in a separate entity
("B&B"). 60 F. Supp. 3d at 395-96. Defendants maintained no accounts with either
Triad Advisors or Tehan, but Tehan received a "finders' fee" from B&B based on
defendants' investment. *Id.* at 396. Under these facts and controlling Second
Circuit precedent, the district court had no difficulty finding a "customer"
relationship with Tehan for purposes of FINRA Rule 12200:

> Defendants' position is essentially that because Tehan provided them
> with a service—investment advice and an introduction, and at least
> some effort to facilitate the B & B transaction—and received
> "transaction—based selling compensation" from B & B as a result, it
> follows that defendants were his customers. I agree.

*Id.* at 397. That Tehan did not receive compensation directly from the defendants
was irrelevant:

> One conceivable view of Triad's position is that because defendants
> did not compensate Tehan directly for his services as an investment

14

advisor, but rather B & B did so as a result of defendants' investment, defendants did not "purchase" his services. But the source of the compensation to Triad's associated person does not matter. Tehan provided a service to defendants and he was paid for it.

*Id.* at 398.

This Court's decision in *Abbar* likewise confirms that a customer relationship exists where services are provided and a broker indirectly receives transaction-based compensation. In defining who constitutes a "customer" for purposes of FINRA Rule 12200, this Court explicitly relied on the definition of "customer" in FINRA Regulatory Notice 12-55, which provides that a "customer" relationship exists for purposes of FINRA's suitability rule where "the broker-dealer receives or will receive, **directly or indirectly**, compensation." *Abbar*, 761 F.3d at 276 n.5 (emphasis added). As such, the law is clear in the Second Circuit that the provision of services and receipt of transaction-based compensation in return, whether directly or indirectly, establishes a "customer" relationship under FINRA Rule 12200.

> **2.   The Registered Brokers performed brokerage services on the CARDS Investors' behalf and received transaction-based compensation in return.**

As recognized by the district court, it is "undisputed that the [Registered Brokers] executed or supervised the execution of various foreign exchange swaps or similar securities transactions on behalf of [the CARDS Investors]." (SPA-9, A-601 at ¶ 10, A-381–393.) The Registered Brokers also effected promissory note

15

transactions in connection with the CARDS Investors' transactions, which

Appellees admit were securities transactions. (A-399 (Deutsche Bank spreadsheet

describing both promissory note and FX transactions for Jermoluk), A-408

(Deutsche Bank AG and DBSI admission that CARDS transaction promissory

notes were securities), A-423 (same), A-430–436 (email chain among Deutsche

Bank personnel, including Sible and Westhoff, referencing as securities the

certificates of deposit and promissory notes in connection with Applegate's

CARDS transaction), A-438–440 (same), A-442–447 (email chain among

Deutsche Bank personnel, including Sible and Westhoff, specifying the Committee

on Uniform Security Identification Procedures ("CUSIP") number for certificates

of deposit and promissory notes in connection with Applegate's CARDS

transaction).) Appellants suspect (although were precluded from obtaining

discovery) that the reason so many Registered Brokers were required to be

involved in CARDS transactions was precisely because they involved securities

transactions.

     As the Registered Brokers understood, these foreign exchange trades and

promissory note transactions were crucial to the tax benefit that the CARDS

transactions were designed to achieve. (A-23–24, A-379–380, A-375, A-468, A-

470.) Further, the Registered Brokers executed the foreign exchange trades and

promissory note transactions solely as directed and authorized by the CARDS

Investors. (A-450 (Sible email: "[I]n the past we have received a letter of

instruction from the client to liquidate part of his remaining Promissory Note,

convert Euros to USD, and hedge the FX position."), A-455 (Sible email to

Aslanian and others: "This spot trade can be executed with Mr. Aslanian on the

phone … or else Mr. Aslanian can sign a letter of authorization for DB to execute

the trade at prevailing EUR/USD exchange rate. … Promissory note Euro interest

… will be transferred from Aslanian accounts to LLC account. (Janet [Sible] will

draft letter of authorization)."), A-458 (Jermoluk letter of authorization to

Westhoff), A-460 (Aslanian letter of authorization to Westhoff), A-462 (Raphael

email to Sible and Westoff: "I await LOAs [for spot trades requested by

Jermoluk]."), A-466 (Sible email referencing letter of authorization from Aslanian

regarding promissory note).) As such, and as found by the district court, the

Registered Brokers unquestionably performed brokerage services on the CARDS

Investors' behalf.

    With respect to compensation, Deutsche Bank's practice was to track

revenue from the CARDS Investors' transactions and recognize that revenue for

the Registered Brokers who worked on those transactions. (A-472 (Sible email to

Westhoff and Jacoby stating that "[e]ach of **your revenue numbers** should be

$113,842 higher" based on the Val Vaden and Thomas Jermoluk CARDS

transactions, and that these higher revenue numbers would be "recognized" for

17

Westhoff and Jacoby.) (emphasis added).) The only reasonable inference to be drawn from this documentation is that the "recognition" of revenue from the CARDS Investors' transactions resulted in transaction-based compensation for the Registered Brokers. The district court did not suggest any contrary inference that could be drawn from the evidence, let alone a reasonable inference, and the Registered Brokers neither disputed that they received this transaction-based compensation nor suggested that this was atypical of how they were normally compensated for brokerage services. (A-603 at ¶ 14.)

Instead, Appellees avoided submitting any evidence on this issue—such as affidavits from the Registered Brokers. As the Court knows, summary judgment is the "put up or shut up" moment in a lawsuit. *See Seat Sack, Inc. v. Childcraft Educ. Corp.*, 2010 WL 245576, at *8 (S.D.N.Y. Jan. 22, 2010); *Kaplan v. Axelrod*, 1990 WL 16148, at *6 (S.D.N.Y. Feb. 15, 1990); *Wagner v. Access Cash Int'l Inc.*, 212 F. Supp. 2d 886, 890-91 (C.D. Ill. 2002) (granting summary judgment and holding that plaintiff should have offered affidavits if testimony would have substantiated plaintiff's position: "summary judgment is the 'put up or shut up' moment in a lawsuit, … [and plaintiff] cannot, in the face of a summary judgment motion, assume that a trial will be held at which time [plaintiff] may prove his case."). Appellee's failure to submit evidence inconsistent with the Registered Brokers' receipt of transaction-based compensation speaks volumes, and this Court should

18

not hesitate to award summary judgment against Appellees in light of that failure.

The undisputed record evidence however establishes that the Registered Brokers received transaction-based compensation for their work on the CARDS Investors' transactions, and all the elements of the "customer" test are met.

### C. The district court misconstrued *Abbar* in finding no "customer" relationship with the Registered Brokers.

In granting summary judgment in favor of Appellees, the district court reasoned that this case is functionally indistinguishable from *Abbar*:

> Here, it is similarly undisputed that the documented core transactional relationships – the CARDS credit agreements – existed between [the CARDS Investors] and [Deutsche Bank] AG, a non-FINRA entity. [The CARDS Investors'] arguments that they should be recognized as customers of [Deutsche Bank] AG's FINRA affiliates and the [Registered Brokers] because numerous ancillary transactions were allegedly performed on their behalf in connection with the CARDS transactions are fundamentally the same as those that were rejected in Abbar under the Second Circuit's bright-line principle. As in Abbar, the services provided by FINRA members were not purchased from the FINRA members and [the CARDS Investors] did not become their customers by virtue of [Appellees'] participation in the implementation of the transactions contemplated by the credit agreements.

(SPA-15.) Though this analysis did not accurately describe the CARDS Investors' arguments, it also misconstrued the clear rule set in *Abbar*: "We hold that a "customer" under FINRA Rule 12200 is one who, while not a broker or dealer, either (1) purchases a good or service from a FINRA member, or (2) has an account with a FINRA member." 761 F.3d at 275. The purchase of a service from

a FINRA member or "associated person" is thus all that is required under this rule. *Id.* at 274 (FINRA Rule 12200 "requires a FINRA member to arbitrate disputes with … the 'customers' of its 'associated persons.'"). And, as shown above, the CARDS Investors purchased services from the Registered Brokers.

Contrary to the district court's opinion, nothing in the Abhar "customer" test suggests: (a) that courts should consider whether the services provided were "core" or "ancillary;" (b) that an investor must—in addition to purchasing a service from a FINRA member or associated person—also have a written contract with that FINRA member or associated person; or (c) that an investor who purchases a service is not considered a "customer" if the investor also has contractual relationships with an entity affiliated with the broker.[4]

The district court's unprecedented narrowing of the "customer" test is inconsistent with the Second Circuit's long-held view that a "customer" for purposes of FINRA Rule 12200 should be construed "broadly"—*e.g., John Hancock Life Ins.*, 254 F.3d at 59—and is inconsistent with the Second Circuit's long-held construction of the term "customer":

> The ordinary meaning of the word "customer" (no special meaning seems intended) is "someone who buys goods or services." *UBS,* 660 F.3d at 650 (internal quotation marks omitted) (citing multiple dictionary definitions). By agreeing to accept "a fee for its services"

---

[4]     Likewise, investors can simultaneously be "customers" of more than one associated entity or individual—for instance, as here, if they purchase services from some individuals but also have accounts with other entities.

20

or by selling securities to an entity, a FINRA member understands that
it may be compelled to arbitrate if a dispute arises with that entity. *Id.*

*Abbar*, 761 F.3d at 275.

Nor does this Court's characterization of the *Abbar* test as a "bright-line

rule" support the district court's judgment. The test is indeed a "bright-line rule"

compared to the alternative considered by *Abbar*: "whether myriad facts will

coalesce into a functional concept of the customer relationship." 761 F.3d at 276

(internal quotations omitted). But characterizing the test as "bright-line" cannot

possibly mean that an investor obtaining the services of an "associated person"

who receives his or her transaction-based compensation via revenue recognition—

like the CARDS Investors' purchase from the Registered Brokers here—is not

"customer." Given the intended purpose of FINRA to provide a forum for pursuit

of broker claims, it cannot be that the source of the broker's transaction-based

compensation matters. This is particularly so since most brokers are not paid

directly by their customers but rather receive compensation indirectly based on the

amounts under management or a percentage of profits generated. As this Court in

*Abbar* noted, "[w]hen it is unclear whether goods or services were in fact

purchased from the FINRA member, discovery (and possibly a trial) may be

required," notwithstanding that the "customer" test is a "bright-line" rule. *Id.* In

any event, trial is not required to find that a "customer" relationship exists on the

undisputed facts here.

21

Further, this Court's finding of no "customer" relationship in *Abbar* is easily distinguishable from the instant case. Here, it is undisputed that the Registered Brokers provided their services **on behalf of the CARDS Investors**. (SPA-9, A-601 at ¶ 10.) By contrast, the district court in *Abbar* made a finding of fact—which this Court held was well supported by the record—that the management services provided by Citi NY (the FINRA member) were primarily on behalf of Citi UK (a non-FINRA affiliate entity), and not Abbar. 761 F.3d at 275.[5] Also, the question in *Abbar* was only whether Abbar was a "customer" of a Citi NY (the FINRA member), not whether Abbar was a customer of registered brokers who were "associated persons" of Citi NY, because Abbar did not sue them. As such, this Court had no occasion to consider, and did not consider, a case like this one where "associated persons" received transaction-based compensation and provided services for investors in connection with their transactions.

For all these reasons, this Court should reverse the district court's grant of summary judgment in favor of Appellees, and direct that summary judgment be granted in favor of the CARDS Investors.

---

[5] This finding of fact made perfect sense given the nature of the underlying transaction. Abbar bought complex options from Citi UK, whereby Abbar would contribute $198 million while Citi UK agreed to contribute between $300 million and $900 million in "leverage" funds. *Abbar*, 761 F.3d at 271. Abbar was entitled to the funds' upside and would bear the first $198 million in any losses, but Citi UK stood to lose its own massive contributions to the fund should losses exceed Abbar's contribution. *Id.*

## II. THE DISTRICT COURT ERRED IN REFUSING TO ALLOW ADDITIONAL DISCOVERY REGARDING THE REGISTERED BROKERS' TRANSACTION-BASED COMPENSATION

Although this Court should grant summary judgment in favor of the CARDS Investors based on the existing record, reversal of the district court's grant of summary judgment is also warranted because it was based on the purported lack of evidence regarding the Registered Brokers' receipt of transaction-based compensation. The district court abused its discretion by refusing to allow additional discovery into that very fact—including by such simple and expedient means as depositions of the Appellees—and then granting summary judgment on this basis. *Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 298-99, 303-04, 307 (2d Cir. 2003)

On two occasions, the district court refused to allow depositions or other additional discovery concerning the compensation received by the Registered Brokers. On October 28, 2015, the CARDS Investors moved to compel "limited scope depositions of Plaintiffs concerning the 'customer' issue." (A-76–77.) Apparently having already substantially come to the conclusion that *Abbar* precluded a finding of a "customer" relationship given "the manner in which and the parties with whom the customer relationship was formed," the district court denied the motion. (A-99.) Following Appellees' motion for summary judgment, the CARDS Investors again moved, on December 21, 2015, for depositions of Appellees concerning their indirect receipt of transaction-based compensation. (SPA-3–4.) The district court again rejected the request, without further

23

explanation. (SPA-5.)

Yet the district court then granted summary judgment in favor of Appellees on the basis that the CARDS Investors had purportedly "produced no evidence" concerning the compensation received by the Registered Brokers. (SPA-15.) This was fundamentally unfair and an abuse of discretion. *See, e.g., Miller*, 321 F.3d at 298-99, 303-04, 307 (grant of summary judgment held premature where non-moving party had not been allowed to conduct depositions regarding key issue: "[W]hen a party facing an adversary's motion for summary judgment reasonably advises the court that it needs discovery to be able to present facts needed to defend the motion, the court should defer decision of the motion until the party has had the opportunity to take discovery and rebut the motion."); *Chipanno v. Champion Int'l Corp.*, 702 F.2d 827, 831 (9th Cir. 1983) ("If the court relied in any part upon any deficiency in plaintiffs' factual showing in opposition to defendants' motion for summary judgment, it would have been error to do so since … plaintiffs were not afforded an adequate opportunity to develop facts in opposition to the motion."). Appellees are obviously in the best position to reveal facts concerning the Registered Brokers receipt of compensation from the CARDS Investors' transactions, and the CARDS Investors' should not have judgment entered against them based on a purported lack of evidence regarding such compensation where the district court steadfastly refused to allow the CARDS Investors to pursue adequate discovery on the issue.

The district court abused its discretion in this regard. As such, the summary judgment against the CARDS Investors should be vacated for this separate reason.

## CONCLUSION

For the foregoing reasons, the district court's judgment should be reversed, and the district court directed to enter summary judgment on the CARDS Investors' behalf.

Dated:  November 18, 2016         Respectfully submitted,


/s/ Spenser Q. Friel
Scott F. Hessell
(shessell@sperling-law.com)
Spenser Q. Friel
(sfriel@sperling-law.com)
SPERLING & SLATER, P.C.
55 West Monroe Street, Suite 3200
Chicago, IL 60603
(312) 641-3200 [Office]
(312) 641-6492 [Fax]

*Attorneys for Defendants-Counter-Claimant-Counter-Defendants-Appellants*

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rule of Appellate Procedure ("FRAP") because this brief contains 5861 words, excluding the parts of the brief exempt by FRAP 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of FRAP 32(a)(5) and the type-style requirements of FRAP 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2013 in 14-point Times New Roman font.

/s/ Spenser Q. Friel
*Attorney for Defendants-Counter-Claimant-Counter-Defendants-Appellants*

# SPECIAL APPENDIX

# TABLE OF CONTENTS

Order of the Honorable Laura Taylor Swain
[Docket No. 25], October 30, 2015 ................................................................... SPA-1

Order of the Honorable Laura Taylor Swain
[Docket No. 37], January 6, 2016 ..................................................................... SPA-2

Memorandum Opinion and Order of the Honorable Laura Taylor Swain
[Docket No. 50], August 4, 2016 ...................................................................... SPA-6

Judgment Appealed From [Docket No. 51], August 5, 2016 ......................... SPA-19

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

DEUTSCHE BANK SECURITIES, INC. et al.,

           Plaintiffs,

      -v-

THOMAS M. ROSKOS, JR., et al.,

           Defendants.

-------------------------------------------------------x

| USDC SDNY |
| :--- |
| DOCUMENT |
| ELECTRONICALLY FILED |
| DOC #: _____ |
| DATE FILED: 0-30-2015 |

No. 15CV534-LTS

ORDER

      For the reasons discussed on the record at the pretrial conference held today in this matter, Defendants' discovery requests, as articulated in a letter to the Court dated October 28, 2015 (Docket Entry No. 23), are hereby denied.

      Summary judgment motion practice will proceed pursuant to the following schedule, as discussed at today's conference:

           Plaintiffs' opening brief due **Monday, December 7, 2015.**

           Defendants' opposition brief due **Monday, January 4, 2016.**

           Plaintiffs' reply brief due **Monday, January 18, 2016.**

           This Order resolves Docket Entry Number 23.

           SO ORDERED.

Dated: New York, New York
      October 30, 2015

                              _____
                              LAURA TAYLOR SWAIN
                              United States District Judge

SPERLING & SLATER
PROFESSIONAL CORPORATION

TELEPHONE
(312) 641-3200
FACSIMILE
(312) 641-6492

55 WEST MONROE STREET
SUITE 3200
CHICAGO, IL 60603

December 21, 2015

**VIA ECF**
The Honorable Laura Taylor Swain
U.S. District Court for the
Southern District of New York
500 Pearl Street
New York, NY 10007-1312

Re:   ***Deutsche Bank Securities, Inc., et al. v. Thomas M. Roskos, Jr., et al.***
      **Case No. 2015 cv 534 (LTS)**

Your Honor:

    I write on behalf of Defendants to request that the Court allow, pursuant to Federal Rule of Civil Procedure 56(d), additional discovery essential to support Defendants' opposition to Plaintiffs' motion for summary judgment, and to request that the summary judgment response date be extended to a reasonable amount of time following the completion of that additional discovery. Plaintiffs oppose this request. (*See* Ex. A.) In the alternative, Defendants request that the summary judgment briefing schedule be extended two weeks—the response date from January 4, 2016 to January 18, 2016, and the reply date from January 18, 2016 to February 1, 2016. Plaintiffs consent to this request in the alternative for a two-week extension.

    This is the first request for an extension of time made by Defendants, although the parties jointly requested two prior extensions (dkts. 12, 21), both of which were granted.

    I certify that Defendants have used their best efforts to resolve informally the matters raised in this submission, including a letter to Plaintiffs' counsel outlining Defendants' legal and factual positions on the matters in controversy (to which Defendants responded by letter), and participating in a telephonic conference with Plaintiffs' counsel.

**Background**

    Defendants asserted claims in FINRA (the "FINRA Arbitration") against Plaintiffs, who, along with Plaintiffs' co-conspirators, defrauded Defendants into six separate Custom Adjustable Rate Debt Structure ("CARDS") transactions. (Dkt. 15 at 16-17, ¶¶ 1-3.) Plaintiffs in turn brought the instant action seeking to enjoin the FINRA Arbitration, contending that Defendants were not "customers" of Plaintiffs with respect to the CARDS transactions, and thus could not be compelled to arbitrate Defendants' FINRA claims. (Dkt. 14, ¶¶ 1-5.)

SPERLING & SLATER

The Honorable Laura Taylor Swain
December 21, 2015
Page 2

Under FINRA Rule 12200, parties are required to arbitrate disputes (upon a customer's request) if the "dispute is between a customer and a member or associated person of a member … and [t]he dispute arises in connection with the business activities of the member or the associated person." *Citigroup Glob. Markets Inc. v. Abbar*, 761 F.3d 268, 274 (2d Cir. 2014); *Triad Advisors, Inc. v. Siev*, 60 F. Supp. 3d 395, 396 (E.D.N.Y. 2014). A "customer" for these purposes includes "one who, while not a broker or dealer, … purchases a good or service from a FINRA member [or associated person]." *Abbar*, 761 F.3d at 274-75.

**Defendants' Request Pursuant to Federal Rule of Civil Procedure 56(d)**

Plaintiffs have now moved for summary judgment based on their assertion that the registered-broker Plaintiffs performed services only "on behalf of non-FINRA members"—not on behalf of Defendants—in connection with Defendants' CARDS transactions. (*E.g.*, Dkt. 27 at 2.) As Plaintiffs apparently recognized, the Second Circuit's *Abbar* opinion (upon which Plaintiffs rely heavily) turned on a factual finding that the broker entity there (Citi NY) acted on behalf of Citi UK, and not on behalf of the parties seeking to bring a FINRA arbitration against the broker entity. *Abbar*, 761 F.3d at 275; *Triad Advisors*, 60 F. Supp. 3d at 397 ("The Second Circuit's holding [in *Abbar*] was simply that the investors were not customers of Citi N.Y. under [FINRA] Rule 12200 because the Citi N.Y. personnel were in fact acting for Citi UK.").

However, Defendants have not yet been able to obtain discovery necessary to test Plaintiffs' assertion that the individual broker Plaintiffs performed services only "on behalf of" Deutsche Bank's non-FINRA entities and not on behalf of Defendants. (*E.g.*, Dkt. 27 at 2.) Among other things, the documents previously produced do not disclose why so many registered brokers (including Plaintiffs Sible, Westhoff, Jacoby, Parker, Fahmy, Raphael and Coleman) did extensive work on Defendants' CARDS transactions, or whether the participation of those registered brokers was a necessary component of the services Deutsche Bank provided to Defendants—basic facts that go directly to on whose behalf the work was done. As such, Defendants should be given an opportunity, before responding to Plaintiffs' motion, to depose Plaintiffs as to whether the registered brokers' services in connection with Defendants' CARDS transactions were provided "on behalf of" Defendants. *See* Fed. R. Civ. P. 56(d).

Moreover, the spotty documents Plaintiffs have thus far produced raise more questions than they answer with respect to the compensation that Plaintiffs received in connection with Defendants' CARDS transactions. For instance, attached as Exhibit B is an email referencing "revenue numbers" being "recognized" for Plaintiffs Westhoff and Jacoby based on Defendants Vaden and Jermoluk's CARDS transactions, but we have not been able to locate similar documents describing compensation, revenue recognition, or business awarded compensation for other Defendants' CARDS transactions, other Plaintiffs or other years. Such documents concerning compensation to the registered brokers based on their work on Defendants CARDS

SPERLING & SLATER

The Honorable Laura Taylor Swain
December 21, 2015
Page 3

transaction is highly relevant to Plaintiffs' pending motion for summary judgment. In particular, Defendants are "customers" of Plaintiffs under FINRA Rule 12200 whether the individual brokers received compensation for their services directly or indirectly. *See Triad Advisors*, 60 F. Supp. 3d at 398 ("One conceivable view of Triad's position is that because defendants did not compensate Tehan directly for his services as an investment advisor, but rather B & B did so as a result of defendants' investment, defendants did not 'purchase' his services. But the source of the compensation to Triad's associated person does not matter. Tehan provided a service to defendants and he was paid for it."). The absence of other documents concerning Plaintiff compensation for services rendered in connection with Defendants' CARDS transactions is another compelling reason Defendants should be entitled to conduct depositions of Plaintiffs, and to give Defendants time to do so before responding to Plaintiffs' motion for summary judgment. The same is true of documents showing "structuring fees" allocated with respect to only some Defendants' transactions and only for some years (*see* Ex. C), and documents listing the "broker %" for only one Defendant's transaction (*see* Ex. D, the first page of a longer email).

As such, Defendants request that the Court allow them to conduct specific and targeted discovery prior to responding to Plaintiffs' motion for summary judgment, and that the summary judgment response date be extended to a reasonable amount of time following the completion of such discovery. In particular, Defendants seek the following additional discovery:

- Depositions of each Plaintiff; and
- Plaintiffs' production of documents that refer to compensation, revenue recognition or business awarded reconciliation for any Plaintiff for their involvement in CARDS transactions generally.

As a compromise, Defendants offered to Plaintiffs that Defendants would accept depositions of only two of the individual broker Plaintiffs and a corporate representative deposition (provided it proves possible to adequately educate a corporate representative concerning any direct or indirect compensation received by Plaintiffs in connection with the Defendants' CARDS transactions, as well as facts concerning on whose behalf the individual broker Plaintiffs provided services in connection with the Defendants' CARDS transactions). Plaintiffs refused that compromise offer (*see* Ex. A), but Defendants suggest that the Court may provisionally order this more limited scope of discovery.

**Plaintiffs' Opposition to the Requested Relief**

Plaintiffs respond that the issues of fact raised above—on whose "behalf" the seven registered brokers rendered services in connection with Defendants CARDS transactions, and whether the brokers were paid for those services—are "irrelevant" to their summary judgment motion. (Ex. A.)

SPERLING & SLATER

The Honorable Laura Taylor Swain
December 21, 2015
Page 4

It is difficult to understand, then, why Plaintiffs' motion for summary judgment repeatedly asserts that the registered-broker Plaintiffs were providing services "on behalf of"—or giving "support to"—Deutsche Bank entities rather than Defendants. (Dkt. 27 at 2, 5, 9.) Although Plaintiffs now claim that their summary judgment motion relies on "irrelevancies" in this regard, Defendants must respond to the motion that was made, and require additional discovery to do so. Moreover, Plaintiffs have no answer (other than a vague reference to their entire motion for summary judgment) for the fact that *Abbar* turned on a factual finding that the broker entity there (Citi NY) acted on behalf of Citi UK, and not on behalf of the parties seeking to bring a FINRA arbitration against the broker entity. *Abbar*, 761 F.3d at 275; *Triad Advisors*, 60 F. Supp. 3d at 397.

Nor do Plaintiffs provide a meaningful reason for why there should be no additional discovery concerning the compensation received by the registered-broker Plaintiffs. The documents already produced make clear that at least some registered-broker Plaintiffs were paid for their work on Defendants CARDS transactions. (*See, e.g.,* Ex. B.) But the produced documents are not comprehensive, and do not cover payments to other Plaintiffs, for other transactions, in other years. Plaintiffs respond that they have produced "any materials in Deutsche Bank's possession relating to fees, compensation or other monetary value received by Deutsche Bank." (Ex. A at 1.) This only makes the need for depositions more clear—if the documents show that broker plaintiffs were paid for their work on Defendants' CARDS transactions, but the documentary record is too spotty to be sure for all Plaintiffs, transactions and years, then depositions are crucial to gain further insight into how (or whether) Plaintiffs were paid for the services they provided. Finally, Plaintiffs have no response to *Triad Advisors*, which makes clear that there is a "purchase" of goods or services sufficient to create a "customer" relationship for purposes of FINRA Rule 12200 whether the compensation was direct or indirect. 60 F. Supp. 3d at 398.[1]

Respectfully submitted,

/s/ Scott F. Hessell
Scott F. Hessell

cc:   All counsel of record (via ECF)

---

[1]   Plaintiffs also assert that they complied with the Court's Individual Practices prior to filing their motion for summary judgment. This is inaccurate. Plaintiffs sent a list of facts upon which they intended to rely only two business days before filing their motion. Contrary to the Court's Individual Practices Rule 2(b)(i)(A), Plaintiffs never provided an outline of the legal positions they intended to take in their motion, and never made any attempt to have a telephonic or in-person conference.

The request for additional discovery is denied.   **SO ORDERED:**
The requested two-week extensions are
granted.

HON. LAURA TAYLOR SWAIN   1/5/2016
UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

DEUTSCHE BANK SECURITIES INC. et al.,

                Plaintiffs,

   -v-                                        No.  15CV534-LTS

THOMAS M. ROSKOS JR. et al.,

                Defendants.

--------------------------------------------------------x

<u>MEMORANDUM OPINION AND ORDER</u>

        Plaintiffs Deutsche Bank Securities Inc. ("DBSI"), DB Alex. Brown LCC ("DB

Alex. Brown") and Private Bank Employees Janet Sible, Mark Westhoff, Michael Jacoby, J.

Ralph Parker, Nancy Fahmy, Michael Raphael, and Mary Ann Coleman (the "PBEs" and,

collectively with DBSI and the PBEs, "Plaintiffs") bring this action against Thomas M. Roskos,

Jr., Dr. Thomas Roskos, Sr., Brion Applegate, Eddy Aslanian, Tom Jermoluk, Val Vaden, and

Lilli J. Rey (collectively, "Defendants") to enjoin an arbitration pending before the Financial

Industry Regulatory Authority ("FINRA").  Plaintiffs have moved for summary judgment

pursuant to Rule 56 of the Federal Rules of Civil Procedure, seeking: (1) an order declaring that

the Defendants' dispute with Plaintiffs is not arbitrable; (2) permanent injunctive relief

preventing Defendants from pursuing their claims in arbitration; (3) dismissal of Defendants'

counterclaim; and (4) an award of all attorneys' fees and costs associated with this action.

Defendants have cross-moved for summary judgment, seeking: (1) a declaration that Plaintiffs

must arbitrate the claims against them; (2) denial of Plaintiffs' motion for summary judgment;

(3) dismissal of Plaintiffs' Amended Complaint; and (4) an award of all attorneys' fees and other

costs associated with this action.  The Court has jurisdiction of this action pursuant to 28 U.S.C.

§ 1331 because the claims asserted in the subject arbitration demand include claims pursuant to

federal statutes.  (See, e.g., Docket Entry No. 14, Amended Complaint ("Am. Compl."), Ex. A

¶¶ 57-73.)

      The Court has reviewed the parties' submissions carefully and, for the reasons set

forth below, Plaintiffs' motion for summary judgment is granted in part, except insofar as DB

Alex. Brown moves for summary judgment as against Defendant Val Vaden.  Defendants' cross-

motion is granted to the extent that it seeks to compel DB Alex. Brown to arbitrate Val Vaden's

claims against it, and is denied in all other respects.

BACKGROUND[1]

      Between 2000 and 2002, the Defendants each engaged in one or more tax shelter

schemes pursuant to what is known as the Custom Adjustable Rate Debt Structure ("CARDS")

strategy.  (Docket Entry No. 29, Pl. 56.1 St. ¶ 1.)  Eventually, the IRS concluded that the

CARDS transactions lacked economic substance and disallowed the losses that had been claimed

by Defendants, who were required to pay their back taxes, along with interest and penalties.  (Id.

¶¶ 17-20.)

---

[1]    The facts recited herein are undisputed unless otherwise indicated.  Facts characterized as undisputed are identified as such in the parties' statements pursuant to S.D.N.Y. Local Civil Rule 56.1 or drawn from evidence as to which there has been no contrary, non-conclusory factual proffer.  Citations to the parties' respective Local Civil Rule 56.1 Statements ("Def. 56.1 St." or "Pl. 56.1 St.") incorporate by reference the parties' citations to underlying evidentiary submissions.

On October 27, 2014, twelve years after the CARDS transactions, Defendants

filed a Statement of Claim with FINRA, alleging that they had suffered injuries stemming from

their participation in the tax shelters.  (Pl. 56.1 St. ¶ 21.)  Defendants named DBSI and PBEs

Sible, Westhoff and Jacoby as parties to the claim, and then later amended the claim to add PBEs

Parker, Fahmy, Raphael, Coleman, as well as DB Alex. Brown.  (Id.)  All of the PBEs either are

now, or have been previously, registered with FINRA.  (Id.; Def. 56.1 St. ¶¶ 1-3.)  DB Alex.

Brown was a broker-dealer firm registered with FINRA until 2001, when it merged with DBSI,

which itself has been registered with FINRA since 2001.  (Def. 56.1 St. ¶¶ 1-3.)

Deutsche Bank AG ("DB AG"), a non-FINRA member, was the primary financial

lending institution with respect to the CARDS transactions, extending bank loans to each of the

Defendants that were memorialized in Credit Agreements executed by special purpose entities

created for each Defendant.  (Pl. 56.1 St. ¶ 2.)[2]  DB AG executed the CARDS loan agreements

with Defendants and received the CARDS loan fee from each Defendant pursuant to the Credit

Agreements.  (Id. ¶¶ 2, 5-6; see also Docket Entry No. 28, Declaration of Allan N. Taffet

("Taffet Decl."), Exs. E-H.)[3]  The accounts holding the collateral for the CARDS loans were,

with one exception, held by Deutsche Bank Trust Company Americas ("Deutsche Bank Private

---

[2]    Defendants note that the initial bank loans from DB AG were made to a third-
      party limited liability company, not to Defendants.  (See Def. 56.1 Counter St.
      ¶ 2.)  Defendants each then acquired only a minority share of the initial loan
      (about 15%) in connection with a separate assumption agreement by which each
      Defendant assumed joint and several liability for the entire loan.  (See id.)

[3]    This fact is generally disputed by Defendants, who argue that, by providing
      brokerage services to Defendants as part of their responsibilities to Deutsche
      Bank, the PBEs entered into "agreement[s]" with Defendants.  (See Def. 56.1
      Counter St. ¶ 5.)

Bank"), also a non-FINRA member.  (Pl. 56.1 St. ¶ 7.)[4]  In or about 2002, certain Defendants

represented to the IRS, under penalty of perjury, that DB AG was the entity that had extended

them the CARDS loans.  (Id. ¶ 18.)

Pursuant to the Credit Agreements signed between Defendants and DB AG, the

PBEs provided support and "services" to Defendants.  (Id. ¶ 14.)  Plaintiffs characterize the

nature of the "services" provided by the PBEs as "administrative" (see id.), while Defendants

claim that the PBEs performed direct financial brokerage services at the direction and on behalf

of Defendants.  (See Def. 56.1 Counter St. ¶ 14.)  It is undisputed that the PBEs executed or

supervised the execution of various foreign exchange swaps and similar securities transactions

on behalf of Defendants.  (Def. 56.1 St. ¶ 10.)  The PBEs also effected promissory note

transactions and foreign exchange trades in connection with Defendants' CARDS transactions.

(Id. ¶ 11.)[5]  Defendants assert that the PBEs were paid transaction-based compensation by

Deutsche Bank and received "lending," "structuring," and "custody" fees in connection with

Defendants' CARDS transactions.  (Id. ¶¶ 14-15.)[6]  Defendants do not allege that they ever met

---

[4]     Defendant Val Vaden also held a collateral account with DB Alex. Brown in
       connection with his CARDS transactions.  (See Def. 56.1 Counter St.
       ¶ 7.)  See also infra note 8.

[5]     Plaintiffs do not dispute that promissory note transactions and foreign exchange
       trades were in fact executed, but assert they were executed on behalf of DB AG at
       the direction, and with express authorization, of Defendants or through their agent
       myCFO, not by direct order from Defendants directly to the PBEs.  (See Docket
       Entry No. 45, Pl. 56.1 Counter St. ¶ 12.)

[6]     Plaintiffs dispute that the evidence cited by Defendants supports the conclusion
       that the PBEs received transaction-based compensation for their work as
       employees of Deutsche Bank in connection with the CARDS transactions,
       arguing that the referenced records show only that revenue generated by
       individual employees was tracked.  (See Pl. 56.1 Counter St. ¶ 14.)

with or spoke to the PBEs.  (Pl. 56.1 St. ¶ 16.)[7]  Of the seven Defendants, only Val Vaden had an

account with DB Alex. Brown that was connected in any way with the CARDS transactions.

(Def. 56.1 St. ¶ 17.)[8]


DISCUSSION

Propriety of Declaratory Relief

Plaintiffs seek a declaratory judgment holding that Defendants' claims against

them are not arbitrable.  Pursuant to the Declaratory Judgment Act, a court "may declare the

rights and other legal relations of any interested party seeking such a declaration in "a case of

actual controversy."  28 U.S.C. § 2201(a); see also Duane Reade, Inc. v. St. Paul Fire & Marine

Ins. Co., 411 F.3d 384, 388 (2d Cir. 2005).  An "actual controversy" exists if there is a

"substantial controversy, between parties having adverse legal interests, of sufficient immediacy

and reality to warrant the issuance of a declaratory judgment."  Duane Reade, 411 F.3d at 388.

More specifically, a court must entertain a declaratory judgment action when the judgment will

serve a useful purpose in clarifying and settling the legal relations at issue, or when it will

terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the

proceeding.  Duane Reade, 411 F.3d at 389.  Given that Defendants have initiated a FINRA

arbitration proceeding against the Defendants, declaratory relief is appropriate in order to clarify

the parties' respective rights to pursue, or have terminated, the arbitration.

---

[7]     Defendants did, however, communicate directly with the PBEs in writing.
        (See Def. 56.1 Counter St. ¶ 16.)

[8]     Certain municipal bond holdings in Defendant Val Vaden's DB Alex. Brown
        account served as collateral to secure his CARDS loan.  (See Pl. 56.1 Counter St.
        ¶ 17.)

Rule 56 Summary Judgment Standard

   Summary judgment is appropriate when, after construing the evidence in the light most favorable to the non-moving party, there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); <u>see also</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).  A fact is considered material if "it might affect the outcome of the suit under the governing law," and a dispute of fact is genuine where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  <u>Rojas v. Roman Catholic Diocese of Rochester</u>, 660 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks and citation omitted).  The opposing party bears the burden of establishing a genuine issue of fact by "citing to particular parts of materials in the record."  Fed. R. Civ. P. 56(c)(1); <u>see also</u> <u>Wright v. Goord</u>, 554 F.3d 255, 266 (2d Cir. 2009).  In determining whether there are genuine issues of material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought."  <u>Johnson v. Killian</u>, 680 F.3d 234, 236 (2d Cir. 2012) (internal quotation marks and citation omitted).  Where, as here, there are cross-motions for summary judgment, these standards are applied with respect to each of the motions.  <u>See</u>, <u>e.g.</u>, <u>Schwabenbauer v. Board of Educ. of City School Dist. of City of Olean</u>, 667 F.2d 305, 314 (2d Cir. 1981) (when considering cross-motions for summary judgment,  "the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.").

FINRA Rule 12200

       FINRA Rule 12200 requires FINRA members to submit to arbitration of a dispute if: (1) arbitration is required by written agreement; or (2) arbitration is requested by a "customer."  See FINRA Rule 12200.  Arbitration upon demand by a customer is mandatory if the arbitration demand concerns a dispute that arose between the customer and a FINRA member or an associated person of a FINRA member in connection with the business activities of the FINRA member or associated person.  Id.  The FINRA Code does not define "customer," except to say that a "customer shall not include a broker or dealer."  FINRA Rule 12200(I).  Here, Defendants claim that they were "customers" of the PBEs, all of whom are or were FINRA-registered brokers (see Docket Entry No. 39, Defendants' Memorandum of Law in Support of Their Cross-Motion for Summary Judgment and in Opposition to Plaintiffs' Motion for Summary Judgment ("Def. Memo"), at p. 8) and, alternatively, that they were customers of DBSI and DB Alex. Brown, which are "associated persons" of the PBEs.  (See Docket Entry No. 49, Defendants' Reply in Support of Their Cross-Motion for Summary Judgment ("Def. Reply"), at p. 7.)

       At the core of the instant dispute is the definition of the term "customer" under FINRA Rule 12200.  The Second Circuit addressed this issue in its 2014 decision in Citigroup Glob. Markets Inc. v. Abbar, 761 F.3d 268 (2d Cir. 2014) ("Abbar").  Prior to Abbar, no "bright line" rule existed for determining whether a FINRA claimant was a "customer" for the purposes of Rule 12200, though certain earlier decisions had addressed the meaning of the term.  See UBS Fin. Servs., Inc. v. W. Va. Univ. Hosps., Inc., 660 F.3d 643, 650 (2d Cir. 2011) (holding that the purchase of a good or service from a FINRA member creates a "customer" relationship);

Oppenheimer & Co. v. Neidhardt, 56 F.3d 352, 357 (2d Cir. 1995) (finding that a "customer"

relationship was created under FINRA Rule 12200 by "placing funds with Oppenheimer for

investment.").

　　　　　The defendant investor in Abbar had lost $383 million that he had invested with

CGML, a United Kingdom affiliate of Citigroup, Inc., that was not a FINRA member.  See

Citigroup Glob. Markets, Inc. v. Abbar, 943 F. Supp. 2d 404, 408 (S.D.N.Y. 2013).  Abbar had

purchased complex option agreements from CGML, which held ownership of all the assets; the

work of structuring and negotiating the option agreements had been done by personnel of CGMI,

a New York affiliate of Citigroup, Inc.  CGMI was a FINRA member with which Abbar had

communicated frequently in connection with his option fund investments.  See id. at 406.

CGML and entities affiliated with Abbar were the only parties named in the two option

agreements.  See id.  Loan facilities were provided by Citibank entities situated in Switzerland.

See id. at 407.

　　　　　Abbar commenced a FINRA arbitration proceeding against CGMI, claiming that

he was a "customer" of CGMI.  CGMI then brought an action in the Southern District of New

York, seeking to enjoin the arbitration.  See id. at 404.  Following a nine-day bench trial in

which the district court had reviewed evidence concerning "the substance, nature and frequency

of each interaction and task performed by the various persons who dealt with Mr. Abbar, their

contemporaneous understandings of whose behalf the person was acting, and the extent to which

the person's activities shaped or caused the transaction," in connection with contentions that

such facts would "coalesce into a functional concept of the customer relationship capable of

supporting a judicial determination," the district court found that Abbar and the other defendants

were not customers of CGMI.  Id. at 407-08.  This conclusion was based "primarily . . . [on] the overwhelming significance of the execution of the transactions with CGML and the Swiss banks, and that the planning, structuring, and other services performed by CGMI in New York were ancillary and collateral to those central core transactions."  See 943 F. Supp. 2d at 408.  Noting, however, that the extensive inquiry underlying that determination was inconsistent with the summary nature of arbitrability determinations contemplated by the federal Arbitration Act, the district court observed that there was a "better way," and held that customer status should be determined by reference to the identity of "the party with which [the investor] has the account and consummates the transaction," in that "[t]he entity in which the investor has his account, and from whom the investor purchases his desired product, defines the legal and business locus of his status as a customer, and is the core of the relationship as a customer."  Id. at 408.

       In affirming the district court's decision, the Second Circuit made clear its intention to set a "bright line rule" for defining the "customer" relationship pursuant to FINRA Rule 12200, and held that a "customer" under FINRA Rule 12200 is one who either (1) purchases a good or service from a FINRA member or (2) has an account with a FINRA member.  See Abbar, 761 F.3d at 275.  Under this formulation, "[t]he only relevant inquiry in assessing the existence of a customer relationship is whether an account was opened or a purchase made; parties and courts need not wonder whether myriad facts will 'coalesce into a functional concept of the customer relationship.'"  Id. at 276 (quoting district court).  "Multiple inputs," the court instructed, "do not necessarily create customer relationships in different places simultaneously," despite the complexity of modern financial transactions.  761 F.3d at 276.  Noting what it deemed the material undisputed facts before it – that Abbar never held an account

with CGMI and, notwithstanding his arguments regarding services performed on his behalf,

"never purchased any goods or services from" CGMI – the Second Circuit held that the new

formulation could readily be applied to reach the conclusion that there was no customer

relationship with a FINRA member.  See id.

Here, it is similarly undisputed that the documented core transactional

relationships – the CARDS credit agreements – existed between Defendants and DB AG, a non-

FINRA entity.  Defendants' arguments that they should be recognized as customers of DB AG's

FINRA affiliates and the PBEs because numerous ancillary transactions were allegedly

performed on their behalf in connection with the CARDS transactions are fundamentally the

same as those that were rejected in Abbar under the Second Circuit's bright-line principle.  As in

Abbar, the services provided by FINRA members were not purchased from the FINRA members

and Defendants did not become their customers by virtue of Plaintiffs' participation in the

implementation of the transactions contemplated by the credit agreements.  Indeed, Defendants

have produced no evidence demonstrating that the compensation that PBEs may have received

directly or indirectly in connection with the CARDS transactions was anything other than an

ancillary consequence of the compensation they received as employees of DBSI or DB Alex.

Brown.

Thus, because Defendants were not account holders of DBSI and purchased no

goods and services from DBSI or the PBEs, they were not "customers" of those Plaintiffs within

the meaning of FINRA Rule 12200, as construed in Abbar, and they are not entitled to arbitrate

their claims against those Defendants.  The Court therefore grants the summary judgment motion

of Plaintiffs DBSI, Janet Sible, Mark Westoff, Michael Jacoby, J. Ralph Parker, Nancy Fahmy,

Michael Raphael and Mary Ann Coleman to the extent that it seeks a declaratory judgment that Defendants cannot compel the DBSI or PBEs to arbitrate Defendants' claims against them in the FINRA arbitration proceeding.

Defendants have, however, demonstrated that Val Vaden is, as a matter of law, entitled to pursue arbitration of his claim against DB Alex. Brown.  It is undisputed that Vaden held an account with that entity, which was a FINRA member at the time of the CARDS transactions, and that the account was used to collateralize the CARDS transactions.  Under the rule established by <u>Abbar</u>, an account relationship creates a customer relationship.  <u>See</u> 761 F.3d at 275.

Applying this rule in the instant case, it is clear that a "customer" relationship existed between Vaden and DB Alex. Brown because Vaden held an account with DB Alex. Brown.  Vaden kept collateral in that account that was used in connection with Vaden's CARDS transactions.  Vaden alleges in the FINRA Statement of Claim that DB Alex. Brown engaged in business activities that were injurious to him (<u>see</u> ECF Docket Entry No. 42-3 (the "FINRA Claim")); thus the claim falls within both the <u>Abbar</u> definition of "customer" and the express language of FINRA Rule 12200.  The Court therefore denies DB Alex. Brown's motion for summary judgment against Val Vaden, grants Val Vaden's cross-motion for summary judgment as against DB Alex. Brown and will enter a declaratory judgment that DB Alex. Brown must arbitrate Vaden's claims in the FINRA arbitration proceeding.

Injunctive Relief

      "To obtain a permanent injunction, a plaintiff must succeed on the merits and show the absence of an adequate remedy at law and irreparable harm if the relief is not granted." Roach v. Morse, 440 F.3d 53, 56 (2d Cir. 2006) (citation omitted).  As explained above, DBSI and the PBEs have succeeded on the merits of their claim.  Moreover, the Court finds that these Plaintiffs will suffer irreparable harm if Defendants are not enjoined from proceeding in the FINRA arbitration, as Plaintiffs would be forced to expend time and resources arbitrating a dispute that is not arbitrable.  See, e.g., Merrill Lynch Inv. Managers v. Optibase, Ltd., 337 F.3d 125, 129 (2d Cir. 2003) (citation omitted).  Injunctive relief is therefore appropriate here and the Court will enter a judgment permanently enjoining Defendants from pursuing their claims against DBSI and the PBEs in FINRA arbitration.

CONCLUSION

      For the foregoing reasons, the Court grants the motion of Plaintiffs DBSI, Janet Sible, Mark Westhoff, Michael Jacoby, J. Ralph Parker, Nancy Fahmy, Michael Raphael, and Mary Ann Coleman in its entirety.  The Court hereby declares that Defendants cannot compel FINRA arbitration against these Plaintiffs of the claims asserted in Defendants' Amended Statement of Claim in FINRA case 14-3280.  (See the FINRA Claim.)  Defendants are permanently enjoined from proceeding with FINRA arbitration of the FINRA Claim against these Plaintiffs.

      The Court grants Plaintiff DB Alex. Brown's motion for summary judgment to the extent that it seeks declaratory and injunctive relief barring FINRA arbitration of the FINRA

Claim as asserted by all Defendants other than Val Vaden. Plaintiff DB Alex. Brown's motion for summary judgment seeking relief as against Val Vaden is denied. Defendant Val Vaden's cross-motion for summary judgment is granted insofar as it seeks to compel DB Alex. Brown to submit to FINRA arbitration of Val Vaden's FINRA Claim against it. All of the Defendants' remaining cross-motions are denied in their entirety.

In light of the fact that neither Plaintiffs nor Defendants have proffered a factual or legal basis for their requests for awards of attorneys' fees or costs, all parties' requests for such fees and costs are denied.

The Clerk of Court is requested to enter judgment accordingly and to close this case.

This Memorandum Opinion and Order resolves Docket Entry Nos. 26 and 40.

SO ORDERED.

Dated: New York, New York
August 4, 2016

   /s/ Laura Taylor Swain   
LAURA TAYLOR SWAIN
United States District Judge

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  8/5/16
```

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------------X
DEUTSCHE BANK SECURITIES INC. et al.,

                                   Plaintiffs,                    15 **CIVIL** 534 (LTS)

         -v-                                                       **JUDGMENT**

THOMAS M. ROSKOS JR., et al.,

                                   Defendants.
--------------------------------------------------------------X

        Plaintiffs having moved for summary judgment pursuant to Fed. R. Civ. P. 56, seeking:

(1) an order declaring that the Defendants' dispute with Plaintiffs is not arbitrable; (2) permanent

injunctive relief preventing Defendants from pursuing their claims in arbitration; (3) dismissal of

Defendants' counterclaim; and (4) an award of all attorneys' fees and costs associated with this

action; and Defendants having cross-moved for summary judgment, seeking: (1) a declaration

that Plaintiffs must arbitrate the claims against them; (2) denial of Plaintiffs' motion for

summary judgment (3) dismissal of Plaintiffs' Amended Complaint; and (4) an award of all

attorneys' fees and other costs associated with this action, and the matter having come before the

Honorable Laura Taylor Swain, United States District Judge, and the Court, on August 4, 2016,

having rendered its Memorandum Opinion and Order and the Court grants the motion of

Plaintiffs Deutsche Bank Securities Inc. ("DBSI"), Janet Sible, Mark Westhoff, Michael Jacoby,

J. Ralph Parker, Nancy Fahmy, Michael Raphael, and Mary Ann Coleman in its entirety. The

Court hereby declares that Defendants cannot compel the Financial Industry Regulatory

Authority ("FINRA") arbitration against these Plaintiffs of the claims asserted in Defendants'

Amended Statement of Claim in FINRA case 14-3280. (See the FINRA Claim.) Defendants are

permanently enjoined from proceeding with FINRA arbitration of the FINRA Claim against

these Plaintiffs.  The Court grants Plaintiff DB Alex. Brown's motion for summary judgment to

the extent that it seeks declaratory and injunctive relief barring FINRA arbitration of the FINRA

Claim as asserted by all Defendants other than Val Vaden; and denying Plaintiff DB Alex.

Brown's motion for summary judgment seeking relief as against Val Vaden; and granting

Defendant Val Vaden's cross-motion for summary judgment insofar as it seeks to compel DB

Alex. Brown to submit to FINRA arbitration of Val Vaden's FINRA Claim against it; and

denying all of the Defendants' remaining cross-motions in their entirety.  In light of the fact that

neither Plaintiffs nor Defendants have proffered a factual or legal basis for their requests for

awards of attorneys' fees or costs, the Court is denying all parties' requests for such fees and

costs; and directing the Clerk of Court to enter judgment accordingly and to close this case.  The

Memorandum Opinion and Order resolves Docket Entry Nos. 26 and 40, it is,

**ORDERED, ADJUDGED AND DECREED:**  That for the reasons stated in

the Court's Memorandum Opinion and Order dated August 4, 2016, the Court grants the motion

of Plaintiffs DBSI, Janet Sible, Mark Westhoff, Michael Jacoby, J. Ralph Parker, Nancy Fahmy,

Michael Raphael, and Mary Ann Coleman in its entirety. The Court hereby declares that

Defendants cannot compel FINRA arbitration against these Plaintiffs of the claims asserted in

Defendants' Amended Statement of Claim in FINRA case 14-3280. (See the FINRA Claim.)

Defendants are permanently enjoined from proceeding with FINRA arbitration of the FINRA

Claim against these Plaintiffs. The Court grants Plaintiff DB Alex. Brown's motion for summary

judgment to the extent that it seeks declaratory and injunctive relief barring FINRA arbitration of

the FINRA Claim as asserted by all Defendants other than Val Vaden. Plaintiff DB Alex.

Brown's motion for summary judgment seeking relief as against Val Vaden is denied. Defendant

Val Vaden's cross-motion for summary judgment is granted insofar as it seeks to compel DB

Alex. Brown to submit to FINRA arbitration of Val Vaden's FINRA Claim against it. All of the Defendants' remaining cross-motions are denied in their entirety. In light of the fact that neither Plaintiffs nor Defendants have proffered a factual or legal basis for their requests for awards of attorneys' fees or costs, all parties' requests for such fees and costs are denied; accordingly, the case is closed.

**Dated:** New York, New York
August 5, 2016

**RUBY J. KRAJICK**

_____
**Clerk of Court**

BY:

_____
**Deputy Clerk**